

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KIMBERLY MCCAIN

Vs.                                              C.A. No.        2013 CA 005093 B

DISTRICT OF COLUMBIA

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to: Judge MICHAEL L RANKIN
Date:  July 24, 2013
Initial Conference: 9:30 am, Friday, October 25, 2013
Location:  Courtroom 517
                500 Indiana Avenue N.W.
                WASHINGTON, DC 20001                                          Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
● **500 Indiana Avenue, N.W., Suite 5000** ●
**Washington, D.C. 20001 Telephone: (202) 879-1133**

KIMBERLY MCCAIN _____ Plaintiff

vs.

**13-0005093**

Case Number _____

DISTRICT OF COLUMBIA
SERVE A.G. NATHAN _____ Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

FREDERIC L. SLITHARD JR
Name of Plaintiff's Attorney

1001 G ST, NW SUITE 800
Address

WASITINGTON, D.C. 20001

20L 463-0880
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오    ያማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                                          CASUM.doc

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

KIMBERLY MCCAIN                          :
2307 Afton St.                           :
Temple Hills, MD. 20748                  :
                                         :
            Plaintiff                    :
      V.                                 :
                                         :       CA: 2013 CA 005093 B
DISTRICT OF COLUMBIA,                    :       JURY TRIAL DEMANDED
Serve: Mayor Vincent C. Gray             :
District of Columbia                     :
Executive Office of the Mayor            :
1350 Pennsylvania Ave., NW               :
Suite 316                                :
Washington, DC 20004                     :
                                         :
Serve: Irvin B. Nathan,                  :
Attorney General                         :
District of Columbia                     :
441 4th St., NW                          :
Suite 1145S                              :
Washington, DC 20001                     :
                                         :
and                                      :
                                         :
KELVIN KING,                             :
in his personal capacity,                :
Serve:                                   :
Metropolitan Police Department           :
Government of the District of Columbia   :
Forensic Science Division                :
Washington, DC                           :
                                         :
and                                      :
                                         :
OFFICER MOATS,                           :
BADGE 2225                               :
in his personal capacity,                :
Serve:                                   :
Metropolitan Police Department           :
Government of the District of Columbia   :
Washington, DC                           :

Defendants.

1

## AMENDED COMPLAINT

Plaintiff, Kimberly McCain, by undersigned counsel, files the above-captioned action against Defendants District of Columbia ("District"), MPD Officer King ("Officer King"), and MPD Officer Moats ("Officer Moats"), and in support thereof states as follows.

## PARTIES

1. Plaintiff Kimberly McCain is a resident of Temple Hills, Maryland, and was an Emergency Medical Technician employed by the D.C. Department of Fire and Emergency Medical Services.

2. Defendant Kelvin King is a police officer with the Metropolitan Police Department for the District of Columbia ("MPD"), and was, at all relevant times, head of the Impaired Driver Support Unit ("IDSU") of the MPD and the principal officer responsible for calibrating breath test machines and testing them for accuracy. Officer King is sued in his individual capacity.

3. Defendant Moats is a police officer with the Metropolitan Police Department for the District of Columbia who was, at all relevant times, employed to carry out chemical breath tests of individuals arrested for DUI, and was the officer who performed this test on the plaintiff. Officer Moats is sued in his individual capacity.

4. Defendant District of Columbia (the "District") is a municipal entity organized under the Constitution and laws of the United States.

5. Defendants King, Moats, and the District of Columbia are hereinafter referred to, collectively, as "Defendants".

## JURISDICTION AND VENUE

6. The jurisdiction of this Court is founded on D.C. Code Section 11-921.

7. Venue is proper as the relevant events took place in the District of Columbia.

## FACTS RELATED TO PLAINTIFF'S ARREST

8. On December 7, 2008, Plaintiff was driving in the District of Columbia and was stopped and detained by a MPD police officer for speeding. The police officer detected an odor of alcohol on Plaintiff's breath, and conducted field sobriety tests on Plaintiff.

9. The police officer arrested Plaintiff and took her to a police substation for booking, fingerprinting, alcohol testing and incarceration.

10. At the substation, Plaintiff was twice administered a breath test by Officer Moats using a machine known as the Intoxilyzer 5000EN ("Intoxilyzer").

11. The Intoxilyzer indicated that Plaintiff's breath alcohol levels were 0.34 and 0.37 grams per 210 liters of breath.

12. These results were false.

13 Although the breath test machine used to test Plaintiff's breath alcohol level was purportedly certified by the MPD as being tested for accuracy within the preceding three months, it had not been properly calibrated or tested for accuracy.

14. In fact, Officer King --who was the officer in charge of calibrating and testing the Intoxilyzer machines — improperly calibrated the machine to generate erroneously high results and failed to properly test the machine to verify its accuracy.

3

15. On information and belief, Officer King knew that police officers or technicians who used the Intoxilyzer machine would not independently investigate whether the Intoxilyzer was properly calibrated and that his failure to properly calibrate and test the Intoxilyzer would remain secret.

16. Based on the false Intoxilyzer test results, Plaintiff was charged with driving while intoxicated (DWI) in violation of D.C. Code Ann. § 50-2201.05.

17. Plaintiff was advised by her attorney that the result of the Intoxilyzer could not be successfully challenged in Court and consequently she pled guilty to DWI in violation of D.C. Code § 50-2201.05.

18. Plaintiff was sentenced to ten mandatory days in jail, a 28-day period in a residential treatment half way house, a $300 fine, a $100 VCA fee (even though there was no victim), and one year of supervised probation with travel restrictions in light of her inaccurately high Intoxilyzer readings.

19. Plaintiff satisfied the requirements of her sentence.

20. DC Code Ann. § 50-2205.03 provides that the results of Ms. McCain's breath test as certified by Officer Moats were admissible as substantive evidence in lieu of a police officer's testimony when the administering police officer or technician (Officer Moats) certifies that the breath test was conducted in accordance with the manufacturer's specifications and the equipment on which the breath test was conducted has been tested within the past 3 months and has been found to be accurate.

21. If the Intoxilyzer results are inaccurate or unreliable, a Court cannot properly enter a DWI conviction against an accused because a valid breath score is a required element for a DWI conviction.

4

22. The plaintiff was terminated from her employment with D.C. FEMS as a result of her conviction.

23. On or after July 26, 2010, the Plaintiff was notified by the D.C. Attorney General that he had received a report from the D.C. Metropolitan Police Department that informed him that the tests performed on the plaintiff were inaccurate, and that there might be remedies available to the plaintiff in Court.

24. D.C. FEMS has been notified of these circumstances, but has refused to rehire the Plaintiff.

**OFFICER KING DISREGARDED
PROPER CALIBRATION AND TESTING PROCEDURE**

25. Plaintiff's Intoxilyzer breath test scores were recorded on a document created and used by the MPD entitled "Chemical Test Certification Form" ("Form").

26. The Form states, in pertinent part, that the Intoxilyzer is approved by the Chief Toxicologist of the OME and that the police officer or technician who administered the Intoxilyzer attests to the accuracy of the test and that the Intoxilyzer itself had been tested and found to be accurate within the past 3 months.

27. According to OAG's documents, the OME delegated the responsibility of maintaining and calibrating the Intoxilyzer to the MPD as early as 1995, specifically to the IDSU, then led by MPD's Officer King.

28. Officer King was the officer designated at all relevant times by the MPD as directly responsible for calibrating the Intoxilyzer and testing the Intoxilyzer for accuracy.

29. Although the law required the MPD to properly calibrate and maintain the Intoxilyzer, Officer King ignored the statutory directive.

30.  The District failed to adequately train or supervise Officer King to ensure that he was properly maintaining and calibrating the Intoxilyzer machines despite the severe risk to the liberty and property of those whose Intoxilyzer results were inaccurately measured but presumptively admissible under statute.

31.  The manufacturer of the Intoxilyzer provided the District and Officer King with specifications to ensure the accuracy and reliability of the breath test machine.

32.  These specifications required testing the machine for accuracy by using a simulator.

33.  To test the accuracy of the Intoxilyzer results, the simulator creates a gas of a known value.  That gas is then pumped into the Intoxilyzer and readings taken.  A properly calibrated Intoxilyzer will report readings which are consistent with the values associated with the simulator gas; an improperly calibrated machine will report a different value.

34.  While an independently tested and known simulator solution can reflect any value, the typical concentration utilized for Intoxilyzer testing and calibration should result in a reading of 0.10 grams per 210 liters of breath.

35.  The Intoxilyzer manufacturer also specifies procedures for calibrating the machine for accuracy.  This procedure consists of testing the machine using a series of simulator solutions of varying strengths.  The Intoxilyzer is only calibrated if it correctly identifies the strengths of the simulator solutions.

36.  The Intoxilyzer is to be taken out of service and repaired if it is inaccurate or improperly calibrated.

37.  In addition, the manufacturer's specifications include procedures to properly maintain the Intoxilyzer to ensure its accuracy and proper operation.

38. Officer King failed to follow the manufacturer's specifications for the proper maintenance, calibration, and accuracy testing of the Intoxilyzer

39 . Specifically, Officer King failed to properly maintain, calibrate, and test the Intoxilyzer used to test Plaintiff within the 3 months preceding the test as required of him.

40. Officer King rejected the required methodology to ensure accuracy and legal sufficiency of the Intoxilyzer and, on information and belief, substituted forensically invalid and unscientific procedures which failed to accurately calibrating the Intoxilyzer and test it for accuracy as required by statute.

41. Officer King knowingly and purposefully utilized out-dated, deteriorated, and uncertified simulator solutions to test the accuracy of the Intoxilyzer.

42. Officer King knowingly and purposefully utilized simulator solutions which were not independently tested or verified.

43. Officer King knowingly and purposefully calibrated the Intoxilyzer utilizing degraded simulator solutions which assured inaccurate readings.

44. On information and belief, Officer King also created his own simulator solutions utilizing the inaccurate Intoxilyzer to determine their strength.

45. Officer King's failure to correctly calibrate the Intoxilyzer, regularly test it for accuracy, and conduct proper simulator checks resulted in inaccurate, forensically invalid and inflated Intoxilyzer readings which rendered plaintiff's breath test results invalid and inaccurate.

46.. Had Officer King properly tested the Intoxilyzer for accuracy following his calibration, he would have discovered that the Intoxilyzer had been improperly calibrated.

7

47. Had the District properly trained and supervised Officer King, the Intoxilyzer would have been maintained and would not have resulted in the plaintiff's invalid and inaccurate Intoxilyzer reading.

48. The MPD, the OME, and the OAG failed to determine or verify the methodology utilized by Officer King for the testing and calibration of the Intoxilyzer, or to determine his accuracy in testing and calibrating the Intoxilyzer, from at least October 2008 to February 2010.

49. Had the District properly trained and supervised Officer King in the performance of his duties, the Intoxilyzers would have been properly calibrated and tested to ensure accuracy and plaintiff would not have been convicted of DWI.

50. Officer King was specifically advised by an expert hired by the District of Columbia that the Intoxilyzer was improperly calibrated, but he ignored that advice and continued to permit Intoxilyzer results he knew were inaccurate to be certified and used in Court as accurate including that of the plaintiff.

51. Had Officer King properly performed his duties and responsibilities he would have determined that the Intoxilyzers results werte inaccurate and inadmissible, and as a result the plaintiff would not have been convicted of DWI.

## THE DISTRICT DISCOVERS OFFICER KING'S IMPROPER CONDUCT BUT REFUSES TO ACT

52. On information and belief, sometime before early 2008, the District consulted an expert in the field of Intoxilyzer calibration and testing in order to assess the validity of breath scores in a particular criminal prosecution.

53. The expert's investigation revealed that neither the OME nor the MPD's IDSU was properly testing the Intoxilyzer for accuracy.

54. The expert advised the District that the testing procedures utilized were not discretionary or a mattedr of judgment, and the representations made in Court about them were contrary to law and that the District needed to alter its testing and certification methodology before further testing results could be proffered in Court.

55. Despite the expert's findings, the District did not take any corrective action and continued to represent in Court and elswkere that the machines were "calibrated and tested for accuracy" as required by statute.

56. On or about February 26, 2010, the District acknowledged for the first time that its Intoxilyzer machines were improperly calibrated and OAG prosecutors began advising judges that the MPD lacked confidence in its breath test results.

57. Plaintiff was unaware of these inaccuracies until so advised by the Attorney General as set out above..

58. As a result of the false alcohol breath test results, plaintiff was wrongfully convicted of DWI and was sentenced as described above.

## OFFICER MOATS' FAILURES

59. Officer Moats carried out the Intoxilyzer tests on the plaintiff.

60. Officer Moats knew or should have known, save reckless disregard, through training and/or experience that the plaintiff's Intoxilyzer readings were significantly inconsistent with the plaintiff's behavior and other indicia of the level of intoxication which was indicated by the Intoxilyzer readings.

61. Despite the clear indications that the results were inaccurate, and ignoring his statutory responsibility to certify the results as described above, Officer Moats took no steps to verify the accuracy of the tests, but rather certified them as accurate.

## COUNT I — NEGLIGENCE AND GROSS NEGLIGENCE
(King, Moats  and the District of Columbia)

62.  Plaintiff repeats and realleges the allegations of paragraphs 1-61 as if fully stated herein.

63.  Defendants owed plaintiff a specific duty of care which defendants breached by failing to ensure, as required by statute, that the breath test equipment used by the MPD to produce evidence for use in plaintiff's DWI prosecution and conviction was properly calibrated and tested.

64.  The purpose of the statute was to specifically protect the plaintiff.

65.  This specific duty of care was distinct and beyond the duty to treat all people equally and fairly and rests on the legal and Constitutional duty of the soverign, through its prosecutors, employees and other agents, to ensure that the evidence it prepares and introduces to justify the fining and imprisonment of specific defendants such as the plaintiff is not false, inaccurate or misleading .

66.  Compliance with the statutory predicate to the introduction of Intoxilyzer evidence was mandatory and not discretionary.

67.  The purpose of the statutory requirements prior to certification was to protect defendants such as the plaintiff who were charged with drunk driving offenses and subject to fines and imprisonment.

68.  The defendants knew or were required to have known that the Intoxilyzer used to test the alcohol content of plaintiff's breath was inaccurate and produced false results yet the defendants certified to the Court that plaintiff's Intoxilyzer results were accurate and the result of testing which met the statutory certification standards.

69.  Plaintiffs did nothing to contribute to defendants' failure to perform their duties.

70.  Defendant Moats had a specific duty to the plaintiff in light of his specialized training to act as a result of the discrepancy between the readings on the Intoxilyzer and the behavior and other indicia of intoxication of the plaintiff, and his failure to do so demonstrated reckless disregard and gross negligence.

71.  Defendant District of Columbia through its employees and agents had a specific duty to the plaintiff after it received the report of the expert that its Intoxilyzer result were statutorily inadmissible to so inform plaintiff's counsel and the Court, and to dismiss the charge against the plaintiff. The failure to do so demonstrated reckless disregard for the liberty and property rights of the plaintiff and gross negligence.

72.  As a direct and proximate result of the negligence and gross negligence of defendants, plaintiff was wrongfully convicted of DWI and was sentenced as described above.

73.  The plaintiff relied upon the purported actual and statutory accuracy of the Intoxilyzer results in her decision to accept the advise of her attorney to plead guilty.

### COUNT II — NEGLIGENT SUPERVISION
(District of Columbia)

74.  Plaintiff repeats and realleges the allegations of paragraphs 1-73 as if fully stated herein.

75.  The District owed Plaintiff a duty of care which the District breached by failing to properly train and/or supervise Officer King and Officer Moats in the calibration, testing and use of the District's breath test machines.

76.  The District knew or should have known that Officer King behaved in an incompetent manner by failing to properly calibrate or test breath test equipment used by the MPD to generate evidence that would later be used to convict persons suspected of driving while intoxicated.

77.  The District knew or should have know that Officer Moats was not properly trained to determine the level of intoxication of individuals charged with being intoxicated or was ignoring that knowledge.

78.  Even though the District had actual or constructive knowledge of these facts, the District failed to adequately train or supervise Officer King and Officer Moats.

79.  Even though the District had actual or constructive knowledge that Officer King was not properly calibrating or testing the District's breath test equipment and Officer Moats was not carrying out the testing in an appropriate manner, the District permitted, or failed to prevent, Officer King and Officer Moats from committing tortious conduct upon premises or using instrumentalities under the District's control.

80.  As a direct and proximate result of the District's negligent supervision of Officer King and Officer Moats, Plaintiff was wrongfully convicted of a DWI, sentenced as described above fired from her employment by the District itself, and denied reemployment. .

### COUNT III — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(King and Moats)

81.  Plaintiff repeats and realleges the allegations of paragraphs 1-80 as if fully stated herein.

82. Officer King's and Officer Moats' conduct and role in providing the prosecutor with false breath test results that Officer King and Officer Moats knew, or should have known, would lead to a DWI conviction, was extreme and outrageous conduct that went beyond all possible bounds of decency, and is utterly intolerable in a civilized community.

83. Officer King's and Officer Moats' conduct in providing the prosecutor with false breath test results that Officer King and Officer Moats knew, or should have known, would lead to a DWI conviction, was reckless.

84. As a result of the false breath test results and ensuing criminal conviction, Plaintiff suffered severe emotional distress in the days and months that followed.

### COUNT IV –VIOLATION OF CIVIL AND CONSTITUTIONAL RIGHTS (42 U.S.C. § 1983)
(King, Moats and District of Columbia

85. Plaintiff repeats and realleges the allegations of paragraphs 1-84 as if fully stated herein.

86. The Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution guarantee substantive rights to citizens of the United States.

87. These rights include substantive due process, a fair trial, to be protected from false evidence utilized to obtain a conviction, and excessive fines or cruel and unusual punishment in relation to the offense.

88. The defendants knowingly fabricated false evidence which they knew would require the jailing of the plaintiff as well as result in fines, a loss of liberty to travel and be free of governmental interference, and, in the case of the District of Columbia, the loss of employment in a way which precluded future employment in the plaintiff's field of expertise.

13

89.  The knowing and callous way in which the defendants acted, ignoring the accuracy of the Intoxilyzer test yet knowing and intending that the results they were certifying would result in the mandatory jailing of the plaintiff and the other results of conviction delineated above for a crime she did not commit, shocks the conscience of a society built on respect for the laws by those who must obey them as well as those who must enforce them.

.     90.  If evidence from a properly certified Intoxilyzer had been utilized, the plaintiff would not have been subject to and convicted of an offense with a mandatory jail term.

91.  The District of Columbia was aware because of the analytical complexity of the Intoxilyzer and the specific instructions of the manufacturer that the Intoxilyzer needed to be recalibrated often and carefully to assure the accuracy of its readings.

92.  The District of Columbia was aware that the failure to recallibrate the Intoxilyzer properly would lead to inappropriately high readings.

93.  The District of Columbia was aware that the failure to properly train and supervise Officer King would likely lead to a violation of the Constitutional rights of citizens such as the plaintiff wrongly accused of DWI, a crime they did not commit, with a mandatory loss of liberty and property as delineated above.

94.  The District of Columbia was deliberately indifferent to the need to train and supervise Officer King to avoid the harm set out above.

95.  These deprivations of the plaintiff's Constitutional rights directly and inescably resulted in the penalties delineated above and consequently was the moving force in the harm to the plaintiff.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that judgment be entered against the

defendants in an amount to be determined for compensatory damages, punitive damages, plus

attorneys' fees and expert fees, and grant such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Superior Court Rules of Civil Procedure, Plaintiff

hereby makes demand for a trial by jury.

Respectfully submitted,

/s/ Frederic W. Schwartz, Jr.

Frederic W. Schwartz, Jr.

Frederic W. Schwartz, Jr.
Suite 800
1001 G St., NW
Washington, D.C. 20001

(202) 463-0880 197137

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically transmitted pursuant to the
Rules of this Court to The Attorney General of the District of Columbia and appended to the
summons and complaint to be served on each of the defendants.

/s/ Frederic w. Schwartz, Jr.
Frederic W. Schwartz, Jr.

15

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA Clerk's Office
CIVIL DIVISION

RECEIVED

JUL 2 4 2013

Su...  Court of the
District of Columbia
Washington, D.C.

KIMBERLY MCCAIN          :
2307 Afton St.
Temple Hills, MD. 20748
                                 :

          Plaintiff       :

     V.                           **13 - 0 0 0 5 0 9 3**
                                 :       CA:   . ..
DISTRICT OF COLUMBIA, :          JURY TRIAL DEMANDED
Serve: Mayor Vincent C. Gray
District of Columbia
Executive Office of the Mayor
1350 Pennsylvania Ave., NW
Suite 316
Washington, DC 20004

Serve: Irvin B. Nathan,
Attorney General
District of Columbia
441 4th St., NW
Suite 1145S
Washington, DC 20001

and

KEVIN KING,
in his personal capacity,
Serve:
Metropolitan Police Department
Government of the District of Columbia
Forensic Science Division
Washington, DC

and

OFFICER MOATS,
BADGE 2225
in his personal capacity,
Serve:
Metropolitan Police Department
Government of the District of Columbia
Washington, DC

Defendants.

<u>COMPLAINT</u>

Plaintiff, Kimberly McCain, by undersigned counsel, files the above-captioned action against Defendants District of Columbia ("District"), MPD Officer King ("King"), and MPD Officer Moats (Moats), and in support thereof states as follows.

### PARTIES

1.      Plaintiff Kimberly McCain is a resident of Temple Hills, Maryland, and was an Emergency Medical Technician employed by the D.C. Department of Fire and Emergency Medical Services.

2.      Defendant Kelvin King ("Officer King") is a police officer with the Metropolitan Police Department for the District of Columbia ("MPD"), and was, at all relevant times, head of the Impaired Driver Support Unit ("IDSU") of the MPD and the principal officer responsible for calibrating breath test machines and testing them for accuracy. Officer King is sued in his individual capacity.

3.      Defendant Moats ("Officer Moats") is a police officer with the Metropolitan Police Department for the District of Columbia ("MPD"), who was, at all relevant times, employed to carry out chemical breath tests of individuals arrested for DUI, and was the officer who performed this test on the plaintiff.  Officer Moats is sued in his individual capacity.

4.

Defendant District of Columbia (the "District") is a municipal entity organized under the Constitution and laws of the United States.

5.      Defendants King, Moats, and the District of Columbia are hereinafter referred to, collectively, as "Defendants".

## JURISDICTION AND VENUE

6.     The jurisdiction of this Court is founded on D.C. Code Section 11-921.

7.     Venue is proper as the relevant events took place in the District of Columbia.

## FACTS RELATED TO PLAINTIFF'S ARREST

7.     On December 7, 2008, Plaintiff was driving in the District of Columbia and detained by a MPD police officer for speeding. The police officer detected an odor of alcohol on Plaintiff's breath, and conducted field sobriety tests on Plaintiff.

8.     The police officer arrested Plaintiff and took her to a police substation for booking, fingerprinting, and incarceration.

9.     At the substation, Plaintiff was twice administered a breath test by Officer Moats using a machine known as the Intoxilyzer 5000EN ("Intoxilyzer").

10.     The Intoxilyzer indicated that Plaintiff's breath alcohol levels were 0.34 and 0.37 grams per 210 liters of breath.

11. These results were false.

12. Although the breath test machine used to test Plaintiff's breath alcohol level was purportedly certified by the MPD as being tested for accuracy by the District of Columbia's Office of the Chief Medical Examiner ("OME") within the preceding three months, it had not been properly calibrated or tested for accuracy.

13. In fact, Officer King — who was the officer in charge of calibrating and testing the Intoxilyzer machines — improperly calibrated the machine to generate erroneously high results and failed to properly test the machine to verify its accuracy.

14. On information and belief, Officer King knew that police officers or technicians who used the Intoxilyzer machine would not independently investigate whether the Intoxilyzer was properly calibrated and that his failure to properly calibrate and test the Intoxilyzer would remain secret.

3

15. Based on the false Intoxilyzer test results, Plaintiff was charged with driving while intoxicated (DWI) in violation of D.C. Code Ann. § 50-2201.05.

16. Plaintiff was advised by her attorney that the result of the Intoxilyzer could not be successfully challenged in Court and consequently she pled guilty to DWI in violation of D.C. Code § 50-2201.05.

17. Plaintiff was sentenced to ten days in jail, a 28-day period in a residential treatment half way house, a $300 fine, a $100 VCA fee (even though there was no victim), and one year of supervised probation wirh travel restrictions.

18. Plaintiff satisfied the requirements of her sentence.

19. DC Code Ann. § 50-2205.03 provides that a copy of the breath test results shall be admissible as substantive evidence in lieu of a police officer's testimony when the administering police officer or technician certifies that the breath test was conducted in accordance with the manufacturer's specifications and the equipment on which the breath test was conducted has been tested within the past 3 months and has been found to be accurate.

20. If the Intoxilyzer results are inaccurate or unreliable, a Court cannot properly enter a DWI conviction against an accused because a valid breath score is a required element for a DWI conviction.

21. The plaintiff was terminated from her employment with D.C. FEMS as a result of her conviction.

22. On or after July 26, 2010, the Plaintiff was notified by the D.C. Attorney General that he had received a report from the D.C. Metropolitan Police Department that the tests performed on her were inaccurate, and that there might be remedies available to her in Court.

23. D.C. FEMS has been notified of these circumstances, but has refused to rehire the Plaintiff.

**OFFICER KING DISREGARDS**
**PROPER <u>CALIBRATION AND</u>**
**<u>TESTING PROCEDURE</u>**

24. Plaintiff's Intoxilyzer breath test scores were recorded on a document created and used by the MPD entitled "Chemical Test Certification Form" ("Form").

25. The Form states, in pertinent part, that the Intoxilyzer is approved by the Chief Toxicologist of the OME and that the police officer or technician who administered the Intoxilyzer attests to the accuracy of the test and that the Intoxilyzer itself had been tested and found to be accurate within the past 3 months by the OME's office.

26. According to the OAG's own documents, the OME delegated the responsibility of maintaining and calibrating the Intoxilyzer to the MPD, as early as 1995, specifically, to the IDSU, led by MPD's Officer King.

27. Officer King was the officer designated by the MPD as directly responsible for calibrating the Intoxilyzer and testing the Intoxilyzer for accuracy.

28. Although the OME directed the MPD to properly calibrate and maintain the Intoxilyzer, Officer King ignored the OME's directive.

29. The District failed to adequately train or supervise Officer King to ensure that he was properly maintaining and calibrating the Intoxilyzer machines.

30. The manufacturer of the Intoxilyzer provided the District and Officer King with specifications to ensure the accuracy and reliability of the breath test machine.

31. These specifications include procedures for testing the machine for accuracy by using a simulator.

32. To be valid, the simulator introduces the gas of a simulator solution into the Intoxilyzer. This simulator solution must be of a known value that is independently tested and verified. The simulator uses this solution to create alcohol saturated air of a known value. That air is then pumped into the machine and tested. Because the value of the alcohol saturated air is known, that known value can be compared to the score generated by the machine to determine if the machine is properly calibrated. A properly calibrated machine will report that the simulator gas is the known value; an improperly calibrated machine will report a different value.

33. Per the manufacturer's specifications, an independently tested and known simulator solution can reflect any value. But, it typically is supplied to Intoxilyzer users, such as the District, at a concentration so that a properly calibrated and accurate Intoxilyzer will test it to read 0.10 grams per 210 liters of breath.

34. In addition, the manufacturer's specifications include procedures for calibrating the machine for accuracy. Similar to the simulator, this procedure consists of testing the machine against a series of known simulator solutions in various amounts. Should the machine fail to correctly identify the various solutions, the machine is to be taken out of service and repaired so that it will.

35. In addition, the manufacturer's specifications include procedures for proper

maintenance of the machine in order to keep it in accurate, good working order.

36. Officer King failed to follow the Intoxilyzer manufacturer's specifications concerning the proper maintenance, calibration, and accuracy testing of the breath test machines.

37. Specifically, Officer King failed to perform proper maintenance of the machine and properly calibrate, test, and find to be accurate the Intoxilyzer used to test Plaintiff within the 3 months preceding his breath test, as required.

38. Rather than follow the manufacturer's specifications, Officer King created a forensically invalid and unscientific policy and procedure on conducting simulator checks, calibrating the machines, and testing the machine for accuracy.

39. Officer King kept and used stale and uncertified simulator solutions. For example, he allowed a simulator solution of supposedly 0.10% grams per 210 liters of breath to deteriorate down to 0.05% grams per 210 liters of breath. In fact, Officer King sometimes permitted the solution value to drop to as low as 0.03% before changing the solution.

40. The solutions used in the field simulator tests were not independently tested or verified. This is akin to trying to tune a guitar with a tuning fork that was independently tested to produce a specific note, but letting the fork degrade so that in reality the fork erroneously played a different note than was intended. Tuning the guitar with the degraded fork would not result in a tuned guitar.

41. Officer King compounded the error by calibrating the Intoxilyzer itself to degraded simulator solutions. This is akin to taking a ten pound weight, hoping it is really twenty pounds, putting it on an uncelebrated scale, and adjusting the scale so that it records the ten pound weight as being twenty pounds. Unsurprisingly, this procedure guarantees an inaccurate scale — the ten pound weight still weighs ten pounds despite the miscalibrated scale's reading to the contrary.

42. Officer King also created his own simulator solution internally, using the miscalibrated breath test machines.

43. Officer King's failure to correctly  7  calibrate the Intoxilyzer, regularly test it for

accuracy, and conduct proper simulator checks resulted in inaccurate, forensically invalid and inflated Intoxilyzer readings and, in particular, rendered Plaintiff's breath test results invalid and unreliable.

44. Had Officer King properly tested the Intoxilyzer for accuracy following his calibration, he would have discovered that the Intoxilyzer had been improperly calibrated.

45. Had the District properly trained and supervised Officer King, the Intoxilyzer would not have been miscalibrated.

46. The erroneous calibration technique used on the Intoxilyzer by Officer King and Officer King's failure to test the machine for accuracy went unchecked by the MPD, the OME, the OAG, or any other District of Columbia governmental agency between, at least, October 2008 and February 2010.

47. Had the District properly training and supervised Officer King in the performance of his duties, the Intoxilyzers would have been properly calibrated and tested to ensure accuracy and Plaintiff would not have been convicted of DWI.

### THE DISTRICT DISCOVERS OFFICER KING'S
### IMPROPER CONDUCT AND FAILS TO ACT

48. Sometime before early 2008, the District consulted an expert in the field of proper Intoxilyzer calibration and testing in order to assess the validity of breath scores in a particular criminal prosecution.

49. The expert's investigation revealed that neither the OME nor the MPD's IDSU was testing the Intoxilyzer for accuracy.

50. The expert told the District that none of the scores were valid if the accuracy tests were not done and that the District needed to change the program and insure that the accuracy tests were done before any scores could be properly proffered in Court.

51. Despite the expert's findings, the District did not take any corrective action and continued to represent that the machines were        "calibrated and tested for accuracy."

9

52. Finally, on or about February 26, 2010, the District publicly acknowledged that its Intoxilyzer machines were improperly calibrated and OAG prosecutors began telling judges that the MPD lacked confidence in its breath test results.

53. Plaintiff was unaware of these inaccuracies until so advised by the Attorney General.

54. As a result of the false breath test results, Plaintiff was wrongfully convicted of a DWI and was sentenced as described above.

## OFFICER MOATS' FAILURES

55. Officer Moats carried out the Intoxilyzer test on the Plaintiff.

56. Officer Moats knew or should have known, save reckless disregard, through training and/or experience that the Plaintiff's Intoxilyzer readings were significantly inconsistent with the Plaintiff's behavior and other indicia of the level of intoxication which was indicated.

57. Despite the indications that the results were inaccurate, and ignoring his responsibility to certify the results as described above, Officer Moats took no steps to verify the accuracy of the tests, but rather certified them as accurate.


## COUNT I — NEGLIGENCE
### (King, Moats and the District of Columbia)

58. Plaintiff repeats and realleges the allegations of paragraphs 1-57 as if fully stated herein.

59. Defendants owed Plaintiff a duty of care which Defendants breached by failing to ensure that the breath test equipment used by the MPD to generate evidence for use in DWI prosecutions was properly calibrated and tested.

60. In fact, the Intoxilyzer used by the District to test the alcohol content of Plaintiff's breath was inaccurate and produced false results that the District nevertheless represented as accurate.

61. Plaintiffs did nothing to contribute to Defendants' failure to perform their duties.

62. Defendant Moats had a specific duty $_{10}$ to the Plaintiff to act in light of the

discrepancy between the readings on the Intoxilyzer and the behavior and other indicia of

intoxication, and his failure to do so demonstrated reckless disregard and gross negligence. .

63. As a direct and proximate result of the negligence of Defendants, Plaintiff was

wrongfully convicted of a DWI and was sentenced as described above.

## COUNT II — NEGLIGENT SUPERVISION
### (District of Columbia)

64. Plaintiff repeats and realleges the allegations of paragraphs 1-63 as if fully stated

herein.

65. The District owed Plaintiff a duty of care which the District breached by failing to

properly train and/or supervise Officer King and Officer Moats in the calibration, testing and use of

the District's breath test machines.

66. The District knew or should have known that Officer King behaved in an incompetent

manner by failing to properly calibrate or test breath test equipment used by the MPD to generate

evidence that would later be used to convict persons suspected of driving while intoxicated.

67. The District knew or should have know that Officer Moats was not properly trained to

determine the level of intoxication of individuals charged with being intoxicated or was ignoring that

knowledge.

68. Even though the District had actual or constructive knowledge of these facts, the

District failed to adequately train or supervise Officer King and Officer Moats.

69. Even though the District had actual or constructive knowledge that Officer King was

not properly calibrating or testing the District's breath test equipment and Officer Moats was not

carrying out the testing in an appropriate manner, the District permitted, or failed to prevent, Officer

King and Officer Moats from committing tortious conduct upon premises or using instrumentalities under the District's control.

70. As a direct and proximate result of the negligence of the District's negligent supervision of Officer King and Officer Moats, Plaintiff was wrongfully convicted of a DWI, sentenced as described above fired from her employment by the District itself, and denied reemployment. .

## COUNT III — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (King and Moats)

71 Plaintiff repeats and realleges the allegations of paragraphs 1-70 as if fully stated herein.

72. Officer King's and Officer Moat's conduct and role in providing the prosecutor with false breath test results that Officer King and Officer Moats knew, or should have known, would lead to a DWI conviction, was extreme and outrageous conduct that went beyond all possible bounds of decency, and utterly intolerable in a civilized community.

73. Officer King's and Officer Moat's conduct in providing the prosecutor with false breath test results that Officer King and Officer Moats knew, or should have known, would lead to a DWI conviction, was reckless.

74. As a result of the false breath test results and ensuing criminal conviction, Plaintiff suffered severe emotional distress in the days and months that followed.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants in an amount to be determined for compensatory damages, punitive damages, plus attorneys' fees and expert fees, and grant such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Superior Court Rules of Civil Procedure, Plaintiff hereby

makes demand for a trial by jury.

Respectfully submitted,

/s/ Frederic W. Schwartz, Jr.

Frederic W. Schwartz, Jr.

Frederic W. Schwartz, Jr.
Suite 800
1001 G St., NW
Washington, D.C. 20001

(202) 463-0880 197137